**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICHARD LANCASTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 11 C 6252** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Lancaster seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion, grants the Commissioner's motion, and affirms the denial of benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on October 9, 2007 and June 2, 2008, respectively, alleging that he became disabled on July 24, 2007 due to sclerosing cholangitis and seizures. (R. 165, 177, 205). The SSA denied the applications initially on July 24, 2008, and again upon reconsideration on October 22, 2008.

(R. 94-97, 101-19). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Curt Marceille (the "ALJ") on September 16, 2010. (R. 31). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from Plaintiff's mother, Charla Huff, and vocational expert Mr. Choice (the "VE").[1] Shortly thereafter, on October 27, 2010, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs he can perform. (R. 9-17). The Appeals Council denied Plaintiff's request for review on September 13, 2011, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of his request for remand, Plaintiff argues that the ALJ: (1) made a flawed credibility assessment; (2) erred in weighing the opinion of his treating physician; and (3) relied on improper VE testimony. Plaintiff also argues in his reply brief that the case should be remanded to consider new evidence. As discussed below, the Court rejects these arguments and finds that the ALJ's decision is supported by substantial evidence.

## **FACTUAL BACKGROUND**

Plaintiff was born on January 1, 1984, and was 26 years old at the time of the ALJ's decision. (R. 165, 177). He has a high school diploma and past relevant work as an auto parts dealer/mechanic. (R. 206, 211).

---

[1] The record does not reflect Mr. Choice's first name.

**A.    Medical History**

**1.    2002 through 2003**

Plaintiff started seeing James R. Clark, M.D., a gastroenterologist with Advocate Good Samaritan Hospital ("Advocate"), on December 17, 2002 due to bleeding in his stool.    (R. 332).    Following a comprehensive multi-system examination, Dr. Clark noted that Plaintiff complained of nausea and vomiting, and exhibited diffuse, mild tenderness in his abdomen with peritoneal signs.  (R. 331, 332).    A Provisional Report from someone identified as "Sandy" from Advocate dated the next day documented "GB [gall bladder] wall thickening" and a "very heterogeneous echo pattern" in the liver, of uncertain etiology.    Sandy suggested a CT scan or endoscopic retrograde cholangiopancreatogram ("ERCP") to further evaluate Plaintiff's condition.  (R. 278).

On December 19, 2002, Plaintiff had random colon biopsies, which showed "[d]iffuse, moderate chronic active colitis."    (R. 286).    A colonoscopy performed by Dr. Clark the same day confirmed a diagnosis of ulcerative colitis. (R. 290-91).    Four days later, on December 23, 2002, Plaintiff had an ERCP, which revealed "[d]iffuse mild dilation of the bile duct, but no filling defects."  (R. 288).  Dr. Clark referred Plaintiff to Louis C. Montana, M.D., of Edward Hospital & Health Services, for a possible cholecystectomy.  (R. 289).

Dr. Montana performed a laparoscopic cholecystectomy and liver biopsy on Plaintiff on December 31, 2002.  (R. 266).  The pathology report showed mild acalculous cholecystitis and "[r]eactive pericystic duct lymph node with lipogranulomata," and Dr. Montana asked John Hart, M.D., of the University of

3

Chicago Hospitals, for a consultative review. (R. 270). Dr. Hart saw Plaintiff on January 8, 2003, and performed needle core biopsies of his liver. Based on Plaintiff's "clinical history of IBD [irritable bowel disease] and ultrasound findings," Dr. Hart determined that "a diagnosis of PSC [primary sclerosing cholangitis] should be considered clinicall[y]." (R. 262).

Plaintiff returned to Dr. Clark on February 26, 2003. The treatment notes are largely illegible, but it is clear that he diagnosed Plaintiff with PSC. (R. 294). It appears that Plaintiff had been taking Colazal for his ulcerative colitis, but stopped using it six days earlier. He also complained of joint pain. Dr. Clark instructed Plaintiff to resume the medication and consult with a rheumatologist. (*Id.*). Shortly thereafter, on March 11, 2003, Dr. Clark completed a Liver Report on Plaintiff for the Bureau of Disability Determination Services ("DDS"), presumably in connection with an earlier application for disability benefits. (R. 308-09). In response to a question about Plaintiff's ability to do work-related activities, Dr. Clark stated only that he "has significant joint pains" and "was referred to [a] rheumatologist." (R. 309).

When Plaintiff saw Dr. Clark again on June 13, 2003, he reported that he had once again stopped taking Colazal two weeks earlier because he could not afford the medication. This had caused his colitis to flare, so Dr. Clark put him back on the medicine. (R. 295). The following month, on July 25, 2003, Dr. Clark gave Plaintiff samples of Colazal to help him "until [his] ins[urance] goes through." (*Id.*). At a follow-up visit with Dr. Clark on October 1, 2003, Plaintiff reported that he was not experiencing any diarrhea, bleeding or abdominal pain,

but he was feeling fatigued.  (R. 296).  Later that month, on October 28, 2003, Plaintiff told Dr. Clark that he had bilateral knee pain and occasional headaches, but no other complaints.  Dr. Clark once again referred Plaintiff to a rheumatologist.  (*Id.*).

### 2. 2004 through 2006

The next available medical record is from nearly a year later on October 21, 2004.  (R. 305-07).  At that time, Dr. Clark completed a Fatigue Report stating that he had been seeing Plaintiff for follow-up visits every three to four months since December 17, 2002.  He indicated that though Plaintiff suffered from occasional headaches and chronic fatigue, he did not have any dizziness and "feels he is able to work."  (R. 305).  Plaintiff had told Dr. Clark that his fatigue was at a level of 5 out of 10, meaning it was "bothersome" but he was still "able to function."  (R. 306).  Dr. Clark concluded that Plaintiff's fatigue did not interfere with his ability to perform daily activities or work, even though he took one or two naps a day lasting from 30 to 90 minutes.  (R. 306-07).  Dr. Clark also noted that PSC is a progressive illness that usually results in the patient needing a liver transplant.  (R. 306).

Plaintiff returned to see Dr. Clark five days later, on October 26, 2004.  At that time, his condition was stable, with no diarrhea, rectal bleeding or abdominal pain, and he was having only two bowel movements per day.  (R. 297).  The following month, on November 19, 2004, Dr. Clark gave Plaintiff 12 days worth of Colazal samples.  (*Id.*).

Plaintiff did not receive further treatment or medical intervention for two years between November 19, 2004 and November 18, 2006. Then on November 19, 2006, Plaintiff went to the Provena St. Joseph Medical Center emergency department ("Provena") complaining of vomiting and chest pain. (R. 456-57). He reported no abdominal pain but "some" diarrhea and loss of appetite, and a chest X-ray was normal. (R. 456, 458). Plaintiff was given Compazine for the nausea and discharged in stable condition. (R. 457).

On December 14, 2006, Plaintiff returned to Provena, this time complaining of knee pain. He denied having abdominal pain or weight loss, and did not report any vomiting, diarrhea, bloody stools or melena.[2] (R. 463). A knee X-ray showed no fracture or soft tissue abnormality, (R. 465), and Plaintiff's symptoms were partially relieved with Toradol. (R. 464). He was discharged in stable condition with a diagnosis of knee arthralgia (joint pain). (*Id.*).

Two days later, on December 16, 2006, Plaintiff went back to Provena due to right hand swelling and vomiting. He attributed the vomiting to vicodin, which he had reportedly been taking since his last visit to Provena,[3] and did not complain of any other abdominal problems. Plaintiff was discharged with a sling on his arm. (R. 466).

---

[2] "Melena" is "[t]he passage of black tarlike stools containing blood." (http://medical-dictionary.thefreedictionary.com/melena, last viewed on December 11, 2012).

[3] The record does not reflect that Plaintiff received a prescription for vicodin when he went to Provena on December 14, 2006.

### 3.    2007

Plaintiff's next visit to Provena on January 17, 2007 followed a motor vehicle crash.  He presented with nausea and had "possibly passed out," but he reported no abdominal pain, vomiting, diarrhea, bloody stools or melena.  (R. 467).  The physician diagnosed cervical strain and possible concussion, and discharged Plaintiff in stable condition with prescriptions for Flexeril and ibuprofen.  (*Id.*).

Nearly eight months later, on September 11, 2007, Plaintiff went to Dr. Clark complaining of crushing pressure on his chest; pain/stiffness/swelling in his joints; nausea or vomiting; and decreased appetite.  (R. 324).  Dr. Clark noted that Plaintiff was not compliant with his medication because he could not afford it without insurance.  His weight was stable at that time but he still had intermittent rectal bleeding.  (R. 298).  Dr. Clark confirmed the diagnoses of PSC and ulcerative colitis, and indicated that Plaintiff had declined to have a magnetic resonance cholangiopancreatography ("MRCP") test due to the expense.  (*Id.*).  At a follow-up visit on September 25, 2007, Plaintiff reported no significant pain, and his ulcerative colitis was "responding well to Colazal."  (R. 299).  Plaintiff again refused the MRCP test due to the cost, and Dr. Clark recommended that he "apply again for Medicaid" and see Jamie Berkes, M.D., a hepatologist at the University of Illinois at Chicago ("UIC").  (R. 299).  Dr. Clark's subsequent October 3, 2007 note is illegible.  (*Id.*).

Dr. Berkes examined Plaintiff on November 26, 2007.  (R. 335-37).  Plaintiff stated that he had been "on and off his medications for ulcerative colitis

based on when he could afford them and when he could get samples." (R. 335). He was not feeling well at that time, and reported having at least 8 bowel movements per day plus 2 or 3 nocturnal bowel movements, with blood in every stool. (*Id.*). He also had "some pruritus [skin itching] especially in the lower extremities which keeps him awake at night." (R. 336). Dr. Berkes concluded that Plaintiff's ulcerative colitis had been "fairly difficult to control," mainly due to insurance problems, and started him on a short course of prednisone. (R. 336-37). Dr. Berkes also wanted Plaintiff to take azathioprine, an immunosuppressant, once he started receiving "Public Aid." (R. 337). With respect to Plaintiff's PSC, Dr. Berkes stated that he would check his liver test and try to start him on ursodiol for the itching. (*Id.*). Dr. Berkes discussed the case with Allan Halline, M.D., a UIC gastroenterologist, and noted that Plaintiff would follow up with the IBD clinic. (*Id.*).

On December 28, 2007, Vinod G. Motiani, M.D., performed a consultative examination of Plaintiff for DDS. (R. 363-65). At that time, Plaintiff was taking prednisone and reported that his diarrhea had improved, and he was going to the bathroom four or five times a day, with occasional blood and mucoid. He described having periodic "flare-up[s] of bloody bowel movements" and a "significant amount of fatigue," but he denied any vomiting, nausea, or abdominal pain, and his weight was stable. (R. 363, 364). Dr. Motiani concluded that Plaintiff has "inflammatory bowel disease and currently seems to be approaching remission." The doctor also reiterated that Plaintiff "has a significant element of fatigue which is attributed to his illness." (R. 365).

### 4.    2008

Approximately one month later, on January 30, 2008, Patricia R. Bush, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff for DDS.[4]  (R. 371-78).  Dr. Bush found that Plaintiff can occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk and sit for about 6 hours in an 8-hour workday.  (R. 372).  She identified no other restrictions, explaining that Plaintiff was not complaining of current diarrhea or bloody stools, and there was no evidence of liver cirrhosis.  Dr. Bush acknowledged that "fatigue is an expected component of [Plaintiff's] illness," but opined that he would be capable of performing light work by July 27, 2008, 12 months after his alleged disability onset date.  (R. 370).

On February 10, 2008, Plaintiff went to Advocate following a possible seizure.  A CT scan of his brain revealed an abnormal ovoid mass in his right nasal cavity, but no intracranial hemorrhage.  (R. 339, 412).  Rockford G. Yapp, M.D., examined Plaintiff and noted that his IBD and ulcerative colitis "does not appear to be an active issue," and concluded that the seizure was not related to these conditions.  (R. 417).  Dr. Yapp expressed some concern that Plaintiff had recently been taken off 5-ASA (mesalamine, an anti-inflammatory drug used to treat inflammatory bowel) and stated that he would contact the "Walter Payton Center" for an explanation.[5]  In the meantime, Dr. Yapp resumed the 5-ASA, and started Plaintiff on Dilantin.  (*Id.*).  A progress note dated the same day confirmed

---

[4]    James L. Greco, M.D., signed the RFC, but Dr. Bush prepared the supporting Case Analysis, which Dr. Greco signed on her behalf.  (R. 370, 378).

[5]    UIC's liver center is known as the Walter Peyton Liver Center.

that Plaintiff's IBD and ulcerative colitis with associated PSC both "seem[ed] stable now and unlikely to be related to seizure."[6]  (R. 353).

Later that month, on February 28, 2008, Plaintiff went to the UIC Liver Clinic but was "unable to stay for a complete history and physical because he needed to leave."  (R. 385).  The nurse instructed him to schedule another appointment, and gave his information to a social worker "to follow up with him facilitating an application for charity care."  (Id.).  On March 27, 2008, Plaintiff sought treatment with Dr. Clark, reporting worsening bowel issues after having stopped all medication.  (R. 527).

Plaintiff returned to Provena on May 24, 2008 complaining that he had been experiencing nausea, vomiting, diarrhea and abdominal pain for the past three or four days, though no rectal bleeding.  Plaintiff stated that he had not been compliant with his medication "secondary to financial reasons," and noted that he had had a seizure after taking prednisone.  (R. 472).  An X-ray of Plaintiff's abdomen revealed no bowel obstruction, (R. 394), and a chest X-ray was normal.  (R. 395).  The doctor prescribed Prilosec, Mylanta and Compazine, and discharged Plaintiff in stable condition.  (R. 473).

On July 2, 2008, Plaintiff went to Provena because he touched his eye with some chemicals while working on his car.  He did not complain of any abdominal problems at that time.  (R. 484).  Shortly thereafter, on July 18, 2008, Solfia Saulog, M.D., completed a physical RFC of Plaintiff for DDS.  (R. 441-48).  Dr. Saulog found that Plaintiff has no limitations, except that he can only

---

[6]      The Court cannot determine who wrote the February 10, 2008 progress note.

occasionally climb ladders, ropes or scaffolds, and must avoid concentrated exposure to hazards (e.g., machinery, heights, etc.) due to his seizure disorder. (R. 443, 445).

Several months later, on October 16, 2008, Plaintiff returned to Provena with chest pains, bloody stools, and vomiting. He had no abdominal pain, an X-ray was largely normal, and he was discharged in stable condition after being treated with Nexium (to reduce stomach acid), Dilaudid (a pain reliever) and Zofran (to prevent nausea and vomiting). Plaintiff received a prescription for phenergan for his symptoms. (R. 486, 489). Four days later, on October 20, 2008, Vincent Francis, M.D. affirmed Dr. Saulog's July 18, 2008 RFC assessment. (R. 450-51). When Plaintiff went back to Provena on December 1, 2008 with swelling in the face and chest congestion, he said nothing about abdominal problems, vomiting, diarrhea or bloody stools. (R. 498-99).

**5.      2009**

Plaintiff visited Provena three times in January 2009 for various issues, but never complained of abdominal problems of any kind. (R. 501, 503-04, 576-77). He failed to show up for an appointment with Dr. Clark on March 10, 2009, (R. 527), and during an examination at Provena on July 22, 2009, he complained of a toothache but once again made no mention of any abdominal problems. (R. 574).

Plaintiff had another visit with Dr. Clark on September 15, 2009, and reported that he was having 5 or 6 stools per day, occasionally bloody, but no abdominal pain. (R. 590). The rest of Dr. Clark's note is difficult to read, but it

appears that he found Plaintiff's ulcerative colitis to be poorly controlled at that time due to noncompliance with medication. (*Id.*). Dr. Clark reiterated this opinion in a letter dated September 22, 2009, explaining that Plaintiff's ulcerative colitis "is very poorly controlled secondary to noncompliance with medications which is a direct result of his inability to afford medication." (R. 588). Dr. Clark noted that Plaintiff also suffered from severe pruritis associated with his PSC, and could not work "due to severe fatigue, presumably related to his underlying chronic medical problems." (*Id.*).

Plaintiff saw Dr. Berkes on September 28, 2009, complaining of diarrhea, insomnia, fatigue and rare pruritis, though no vomiting, nausea, melena or bloody stools. (R. 672). Given Plaintiff's lack of progress in obtaining health care coverage, Dr. Berkes wanted to "get him plugged into the Charity Care program." (R. 673). At his next appointment with Dr. Berkes on November 9, 2009, Plaintiff had not pursued the Charity Care option because his mother needed to "get back to Aurora to pick up her daughter from school and therefore could not meet with them." (R. 668). Plaintiff continued to complain of diarrhea and fatigue, and was having between 5 and 8 loose stools a day. (*Id.*). Dr. Berkes expressed concern that Plaintiff had not been in touch with Charity Care since his last visit, and instructed him to return in two months to "begin further testing." (R. 669).

### 6.    2010

Plaintiff saw Dr. Berkes again on March 1, 2010. He still had not followed up with Charity Care, though he was having 4 to 5 episodes of diarrhea a day, sometimes bloody, plus occasional pruritis and fatigue, and arthritis in his knees.

(R. 662). Dr. Berkes wanted to obtain updated lab tests and perform an MRCP test, an endoscopy and a colonoscopy. Dr. Berkes told Plaintiff to return in three months, by which time he would hopefully have Medicaid or some other form of medical coverage. (R. 663).

On April 8, 2010, Eric R. Kallwitz, M.D., of UIC performed an upper GI endoscopy on Plaintiff. (R. 677-78). The test showed: "LA Grade A reflux esophagitis"; "Non-bleeding grade II esophageal varices"; and normal "cardia, gastric fundus, gastric body and antrum." (R. 678). The same day, Dr. Kallwitz also performed a flexible sigmoidoscopy on Plaintiff. (R. 680-81). This test revealed inflammation in the colon secondary to ulcerative colitis. (R. 681).

A few weeks later, on April 27, 2010, Sheldon J. Slodki, M.D., prepared a Medical Source Statement of Ability to do Work-Related Activities (Physical) of Plaintiff for DDS. (R. 597-602). Dr. Slodki found no exertional restrictions, (R. 597), but limited Plaintiff to no climbing of stairs, ramps, ladders or scaffolds, (R. 600), and no working at unprotected heights or around moving mechanical parts or other hazards. (R. 601). Dr. Slodki also completed a Medical Interrogatory Physical Impairment(s) form, stating that Plaintiff suffers from chronic liver disease/PSC, IBD, and seizure disorder, but that his conditions do not meet or equal any listing in the Social Security Regulations. (R. 604-06).

Also on April 27, 2010, Plaintiff went to Provena complaining of acute conjunctivitis and pharyngitis. (R. 612). An abdominal X-ray showed "[m]ildly prominent air filled loops of bowel . . . that are non-specific and could represent focal ileus [intestinal obstruction]." (R. 633). Plaintiff was admitted to the hospital

on April 28, 2010, and "improved significantly" following treatment. He was discharged on May 3, 2010 with prescriptions for Asacol and Imuran, as well as Imodium and Florastor (a probiotic). (R. 612).

On June 7, 2010, Plaintiff went to see Rana Abraham, M.D., an associate of Dr. Kallwitz, primarily for gastrointestinal complaints. Dr. Abraham stated that the flexible sigmoidoscopy showed moderate to severe pan colitis to the descending colon. (R. 656). Plaintiff had been taking Asacol as prescribed and was feeling less fatigued and having fewer bowel movements per day (3 to 4 instead of 5 to 6). He also described having fewer episodes of bloody stool, down to 2 or 3 times per week. Plaintiff did not have any abdominal pain at that time, but his bilateral arthralgias had worsened to the point where it was difficult for him to walk. (*Id.*).

Dr. Abraham stated that the Asacol was "not sufficient to keep [Plaintiff] in remission," and he would likely benefit from immunomodulators to treat his IBD and related arthralgias. (R. 657). With respect to Plaintiff's liver cirrhosis, it was "well compensated," but Dr. Abraham recommended that he start taking propranolol (a beta-blocker). (*Id.*). Dr. Abraham referred Plaintiff to a rheumatologist and instructed him to return in 4 months. (*Id.*). The record does not reflect that Plaintiff followed this recommendation or received any additional treatment after June 7, 2010.

**B.    Plaintiff's Testimony**

At the September 16, 2010 hearing before the ALJ, Plaintiff (now 26 years old) testified that he stopped working as an auto mechanic in 2007 because he was "missing a lot of work due to being sick all the time."  (R. 33).  His employer tolerated his frequent bathroom breaks for three years but eventually "got sick of me not . . . doing what I was supposed to be doing."  (R. 34).  Plaintiff explained that there was a significant gap in his treatment between 2003 and 2007 because he did not have health insurance and could not afford care or medication.  (R. 36-37).  He applied unsuccessfully for Medicaid in 2007 or 2008 and missed an opportunity to receive Charity Care in November 2009 due to a scheduling conflict.  (R. 37, 38).  He thus relied primarily on free samples from his doctors and hospital visits.  (R. 37, 38).  By the time of the hearing date, however, Plaintiff had been placed on a medical assistance program ("MAP") and was taking something similar to Asacol, which was helping his condition.  (R. 35-36).

Plaintiff initially testified that he has diarrhea "constant[ly]," (R. 40), then said that it "var[ies] from one to none" a day.  (R. 59).  He has anywhere from two to five bowel movements a day, requiring him to be in the bathroom for 15 or 20 minutes at a time, though this also varies depending on what he eats and whether he has taken his medication.  (R. 57, 58).  Plaintiff does not wear protective undergarments but has soiled himself "numerous times," meaning four or five times in the previous year or two.  (R. 54-55).

During the day, Plaintiff hangs out, relaxes, takes a nap, sometimes goes to the store, and goes out to dinner once or twice a month.  (R. 53-54).  He also

surfs the internet and occasionally does dishes and works on his car, but his mother does not want him doing any yard work. (R. 55-56, 57, 72). Plaintiff estimates that he can frequently lift 10 pounds, occasionally lift 20 or 30 pounds, stand and sit for an hour and a half at a time, and use his hands without limitation. (R. 52-53). He can only walk a couple hundred feet, however, because of the arthritis in his knees, which causes him pain at a level of 8 out of 10. (R. 63).

Plaintiff testified that he is "constantly tired" and takes one or two naps a day, lasting from 15 minutes to an hour. (R. 64). He attributes this to "low iron" and his medications, particularly the propranolol. (R. 64-65). The main reasons he does not feel he can work are the "constant . . . bathroom issues" and the "tiredness." (R. 65-66). If he were able to get his condition under control someday, he'd "be willing" to go back to work. (R. 69, 70).

**C.      Testimony of Charla Huff**

Plaintiff's mother, Charla Huff, accompanied Plaintiff to the hearing and testified on his behalf. Ms. Huff stated that Plaintiff sometimes spends 30 to 45 minutes in the bathroom, and is "always tired" to the point where he occasionally dozes off while she is talking to him. (R. 74, 80). She paid for some of Plaintiff's medical visits herself, but cannot afford medication or procedures. (R. 76). His condition has gotten worse and every day he is tired, sick to his stomach and in pain. (R. 79).

**D.     Vocational Expert's Testimony**

Mr. Choice testified at the hearing as a VE.  The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can: occasionally lift 20 pounds; frequently lift 10 pounds; and stand, walk and sit for up to 6 hours in an 8-hour workday; but cannot climb ladders, ropes, scaffolds, ramps or stairs; and cannot work at unprotected heights or around dangerous moving machinery.  (R. 87).  The VE testified that such a person would not be able to perform Plaintiff's past work, but he could still work as a retail salesperson (approximately 3,000 jobs available), information clerk (approximately 4,000 jobs available), or housekeeper (approximately 5,000 jobs available).  (R. 88).  If the person needed two to three extra breaks during the day in addition to his regular breaks, then he could perform approximately 2,000 housekeeping jobs.  (R. 88-89, 92).

**E.     Administrative Law Judge's Decision**

The ALJ found that Plaintiff's ulcerative colitis, PSC, and history of seizures are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 11-12). After discussing the medical and testimonial evidence in detail, the ALJ determined that Plaintiff has the capacity to perform light work with the following restrictions: he cannot climb ladders, ropes, scaffolds, ramps or stairs; and he cannot work near hazards, such as unprotected heights and dangerous moving machinery.  (R. 13).

In reaching this conclusion, the ALJ noted that Plaintiff continues to engage in a wide range of activities despite his impairments, including hanging out, relaxing, going to the store, driving, visiting family, going out for dinner, surfing the internet, doing dishes, and working on his car. (R. 18). Though he claims that he needs access to a bathroom and has soiled himself 4 or 5 times in the past year and a half, he does not wear protective undergarments. In addition, Plaintiff "generally denied significant diarrhea or fatigue to his treating physicians on many occasions," and his weight has remained stable. (R. 19). The ALJ acknowledged that Plaintiff has a sporadic treatment history due to insurance problems, but also found it significant that he "responds well to medications, and is generally stable on medication." (*Id.*).

With respect to the opinion evidence, the ALJ gave "little weight" to Dr. Clark's September 2009 statement that Plaintiff is unable to work due to severe fatigue. The ALJ observed that Dr. Clark gave that opinion after not having seen Plaintiff for more than a year, and that he provided "no actual assessment of any specific limitations," nor any support for his conclusion. (R. 21). At the same time, the ALJ gave significant weight to the opinions of the State agency physicians and Dr. Slodki, which he found "consistent with the evidence of record." (*Id.*).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of jobs available in the national economy, including retail sales person, information clerk, and cleaning/housekeeping. (R. 22). The ALJ thus concluded that Plaintiff is not

disabled within the meaning of the Social Security Act, and is not entitled to benefits.

**DISCUSSION**

**A.    Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g).   In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations.   *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted).   Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."   *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astru*e, 478 F.3d 836, 841 (7th Cir. 2007)).   The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."   *Simila v. Astru*e, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).   Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."   *Hopgood ex rel. L.G. v.*

*Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.    Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act.[7] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).  A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff argues that the ALJ's decision should be reversed because he: (1) made a flawed credibility assessment; (2) erred in weighing the opinions of his

---

[7]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*  The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*

treating physicians; and (3) relied on improper VE testimony. Plaintiff also argues in his reply brief that the case should be remanded to consider new evidence, i.e., a November 21, 2011 letter from Dr. Kallwitz.

### 1.    Credibility Assessment

Plaintiff first objects that the ALJ should have credited his testimony that he suffers from constant diarrhea and fatigue. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id. See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

The ALJ determined that the medical evidence in this case does not support Plaintiff's complaints of disabling diarrhea and fatigue. After being diagnosed with ulcerative colitis and PSC in 2003, Plaintiff saw Dr. Clark one time from October 29, 2003 until September 10, 2007. At that single visit, on October 26, 2004, his condition was stable with no diarrhea, rectal bleeding or

abdominal pain. (R. 15, 297). Though Plaintiff went to the hospital seeking treatment four times during that same period, none involved diarrhea or fatigue related to his impairments. On September 11, 2007, Plaintiff returned to Dr. Clark with intermittent rectal bleeding, noting that he had not been able to afford his medication. (R. 15, 298). By September 25, 2007, however, Plaintiff was "responding well to Colazal" and reported no significant pain. (R. 15, 299).

When Plaintiff saw Dr. Berkes on November 26, 2007, he reported having at least 8 bowel movements per day plus 2 or 3 nocturnal bowel movements, all with blood. (R. 335). Yet the diarrhea had improved with prednisone as of December 28, 2007, with Dr. Motiani concluding that notwithstanding Plaintiff's significant amount of fatigue, his IBD "seems to be approaching remission." (R. 15, 365). Dr. Yapp confirmed this assessment on February 10, 2008, noting that Plaintiff's IBD and ulcerative colitis "does not appear to be an active issue." (R. 417). Plaintiff saw Dr. Clark for a flare-up in March 2008 after he stopped taking his medication due to the cost, (R. 527), and additional flare-ups sent Plaintiff to the hospital in May and October 2008. (R. 16).

Thereafter, Plaintiff did not seek further treatment for his ulcerative colitis or PSC for nearly a year until September 15, 2009. At that time, Dr. Clark observed that Plaintiff's ulcerative colitis was not well controlled because he could not afford his medication. (R. 17, 590). Dr. Berkes agreed with this assessment on September 28 and November 9, 2009. (R. 672, 668). Plaintiff was not doing well when he saw Dr. Berkes again on March 1, 2010, reporting 4 to 5 episodes of diarrhea a day and fatigue. (R. 17, 662). By June 7, 2010,

however, Dr. Abraham found that Plaintiff was feeling less fatigued, having fewer bowel movements per day (3 or 4), and having fewer episodes of bloody stool (2 or 3 times per week) after taking Asacol.  (R. 18, 656).

Plaintiff claims that this analysis "glosses over the harsh realities of [his] incessant hospital visits."  (Doc. 27, at 14).  The Court disagrees.  Between November 2006 and June 2010, Plaintiff went to the hospital seeking treatment 13 times.  Yet he only complained of diarrhea and related abdominal problems, including bloody stool, on three occasions:  November 19, 2006 (R. 456-57); May 24, 2008 (472); and October 16, 2008 (R. 486).  The other times Plaintiff sought treatment for other conditions, such as eye or knee problems.  This does not qualify as an "incessant" number of hospital visits for his ulcerative colitis and PSC, or as evidence of disabling diarrhea and fatigue.

Contrary to Plaintiff's suggestion, the ALJ did not end his analysis with a statement that the objective medical evidence is lacking.  *Cf. Fredenhagen v. Astrue*, No. 09 C 4936, 2010 WL 3937474, at *12 (N.D. Ill. Oct. 4, 2010) (remanding case where the ALJ "discredit[ed] plaintiff's testimony by solely relying on the lack of objective medical evidence.").  Instead, consistent with the requirements of SSR 96-7p, the ALJ went on to note that Plaintiff continues to engage in a wide range of daily activities despite his limitations, including hanging out, relaxing, going to the store, driving, visiting family, going out for dinner, doing dishes, surfing the internet and working on his car.  (R. 18).  The ALJ also observed that Plaintiff "responds well to medications, and is generally stable on medication."  (R. 19).

Plaintiff insists that his activities are not evidence of his ability to work, citing the Seventh Circuit's caution against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680. The only factors Plaintiff identified as affecting his ability to perform daily activities are constant diarrhea and fatigue. (R. 53-54). Yet Plaintiff admitted that his diarrhea is not in fact constant, but instead "var[ies] from one to none" per day, and does not require him to wear protective undergarments.[8] (R. 18, 40, 54, 59). The medical record similarly reflects that Plaintiff experienced long stretches where he did not seek treatment for diarrhea, even though he pursued treatment for other unrelated conditions. Plaintiff may need regular access to a bathroom, (Doc. 27, at 16), but that does not mean that he is disabled from diarrhea.

In addition, Plaintiff mentioned fatigue to his physicians only three times between December 2007 and June 7, 2010: (1) on December 28, 2007, when he told Dr. Motiani that he was experiencing a "significant amount of fatigue" (R. 363); (2) more than two years later, on March 1, 2010, when he "admit[ted] to . . . fatigue" during a visit with Dr. Berkes, (R. 662); and (3) at an appointment with Dr. Abraham three months later, when he reported less fatigue. (R. 656). This dearth of complaints is difficult to reconcile with a claim of debilitating fatigue, particularly where Plaintiff sought "a significant amount of treatment" during that time, including some 10 hospital visits and 8 doctor appointments. (R. 19).

---

[8] Plaintiff testified that he also has between two and five bowel movements per day. (R. 57, 58).

*Compare Cuevo v. Barnhart*, No. 06 C 5783, slip op., Doc. 27, at 22 (N.D. Ill. Aug. 27, 2007) (noting that a claimant should not be penalized for failing to seek treatment due to financial difficulties).[9]

Plaintiff attempts to mitigate this evidence by noting that "fatigue is an expected component of [his] illness." (Doc. 37, at 5). The ALJ acknowledged as much, (R. 20), but as the Seventh Circuit has explained, [t]hat fatigue is a common symptom . . . reveals nothing about the severity, intensity, or persistence of fatigue that any individual may experience at a particular point in time." *Milliken v. Astrue*, 397 Fed. Appx. 218, 223 (7th Cir. 2010). Plaintiff's mother did testify that her son's fatigue is so severe that he actually nods off in the middle of conversations. (R. 74, 80). The ALJ reasonably discounted this testimony, however, given that Plaintiff stayed awake throughout the hearing, and "there is no indication that he did this [dozed off] at any treatment session." (R. 20).

Plaintiff finally objects that the ALJ made a "glaring omission" by failing to note that his daily activities include one or two naps each day lasting between 15 minutes and an hour. (Doc. 37, at 5). The Court does not find this omission to be reversible error in light of the ALJ's full discussion of Plaintiff's fatigue. It is well-established that an ALJ "is not required to address every piece of evidence or testimony presented." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). Here, the ALJ expressly considered Plaintiff's testimony regarding how his

_____

[9]    The ALJ made it clear that he was "not denying [Plaintiff's] application on the basis of his failure to follow prescribed treatment," but merely "not[ing] . . . that the multiple times [Plaintiff] sought treatment, he rarely complained of fatigue." (R. 19).

"constant" fatigue affects his ability to function, as well as related medical evidence. Notably, Plaintiff never told his physicians that he needs to take naps, and none of them recommended that he do so. In addition, Plaintiff tied the length of his naps to "what's going on in the house," which suggests that he has some control over his sleeping habits based on external factors. (R. 64). On the record presented, the Court is satisfied that the ALJ built a logical bridge between the record evidence and his decision to discount Plaintiff's testimony regarding the extent of his fatigue and diarrhea. This determination is not patently wrong, and the Court thus declines to remand the case on this basis.

### 2. Weight of Treating Physician Testimony

Plaintiff next challenges the ALJ's decision to afford "little weight" to Dr. Clark's September 22, 2009 opinion that he is disabled. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5)

whether the opinion was from a specialist.  20 C.F.R. § 404.1527(c)(2)-(5).  *See, e.g.*, *Simila*, 573 F.3d at 515.

Dr. Clark opined in September 2009 that Plaintiff "is unable to work due to severe fatigue, presumably related to his underlying chronic medical problems." (R. 595).  As the ALJ noted, however, Dr. Clark had not seen or heard from Plaintiff for more than a year when he made this assessment.  (R. 21, 527). Indeed, his last treatment note prior to the September 2009 evaluation is dated June 23, 2008, and indicates that Dr. Clark left a message for Plaintiff stating that he should "probably" have his doctors at UIC complete his disability paperwork "for more recent data."  (*Id.*).  The ALJ reasonably questioned why Dr. Clark was able to certify that Plaintiff is disabled after seeing him once over the course of more than a year.  *See, e.g., Brown v. Astrue*, No. 10 C 2153, 2012 WL 280713, at *13 (N.D. Ill. Jan. 30, 2012) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

The ALJ further observed that Dr. Clark failed to provide any "actual assessment of any specific limitations."  (R. 21).  There is no explanation, for example, of how Plaintiff's fatigue manifests itself or impacts his ability to function and work.  Nor did Dr. Clark caution Plaintiff against engaging in certain activities.  As noted earlier, moreover, Plaintiff himself rarely complained of fatigue, much less fatigue that renders him completely disabled.  The ultimate decision whether a claimant is "disabled" is reserved for the Commissioner, *Higdon v. Astrue*, No. 08-776-JPG-PMF, 2010 WL 1963429, at *4 (S.D. Ill. Apr.

22, 2010), and the ALJ did not err in discounting Dr. Clark's September 2009 "feeling" that Plaintiff "is unable to work." (R. 21, 527).

Also unavailing is Plaintiff's assertion that the ALJ "supplant[ed] a treating doctor's opinion with his own." (Doc. 27, at 17). In determining that Plaintiff is capable of light work as long as he avoids climbing activities and hazards, the ALJ gave "significant weight" to Dr. Slodki's April 27, 2010 opinion to that effect. (R. 21, 597, 600-01). Plaintiff points to no contrary RFC, and the ALJ's reliance on Dr. Slodki's opinion was entirely proper. The Court finds no evidence that the ALJ succumbed to the temptation to play doctor in this case. *See Lott v. Astrue*, No. 11 C 5632, 2012 WL 5995736, at *8 (N.D. Ill. Nov. 30, 2012) ("[A]n ALJ does not play doctor where her determinations are supported by the record evidence and testimony.").

### 3.     VE Testimony

Plaintiff claims that the case must still be remanded because the ALJ posed an incomplete hypothetical question to the VE that did not include all of his limitations. (Doc. 27, at 13). Plaintiff first contends that the record contains "[n]o . . . facts" supporting the ALJ's determination that he can stand and walk for 6 hours, and sit for 2 hours in an 8-hour workday. As a result, Plaintiff says, the ALJ should have relied on his hearing testimony that he cannot sit or stand for more than an hour and a half at a time. (*Id.*). Plaintiff also objects that the hypothetical said nothing about naps. (Doc. 37, at 12, 13). These arguments misstate the record evidence, and ignore the fact that a hypothetical question need only "set forth the claimant's impairments to the extent that they are

supported by the medical evidence in the record." *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) (internal quotations omitted). *See also Wurst v. Astrue*, 866 F. Supp. 2d 951, 964-65 (N.D. Ill. 2012).

In January 2008, Dr. Bush found Plaintiff capable of standing, sitting and walking for 6 hours in an 8-hour workday. (R. 372). She identified no other restrictions, even though "fatigue is an expected component of [Plaintiff's] illness." (R. 370). In July 2008, Dr. Saulog determined that Plaintiff has no limitations at all in his ability to stand, sit and walk, (R. 442), a conclusion Dr. Slodki confirmed in April 2010. (R. 597). Plaintiff points to no contrary medical opinion regarding his physical limitations. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) ("The ALJ may properly rely upon the opinion of [state agency] medical experts."). Nor is there credible evidence that Plaintiff has any specific work restrictions due to fatigue. On the record presented, the ALJ's hypothetical question included all reasonable limitations supported by the medical evidence.

Plaintiff disagrees, arguing that the ALJ failed to consider his impairments in combination. (Doc. 37, at 5). Plaintiff directs the Court to *Villano v. Astrue*, 556 F.3d 558 (7th Cir. 2009), where the Seventh Circuit observed that "a person who is obese and arthritic may experience greater limitations than a person who is only arthritic." *Id.* at 562. Of course, Plaintiff is not obese, but in any event, the ALJ did in fact consider the combined impact of his impairments. The ALJ discussed in detail the effects of Plaintiff's PSC, ulcerative colitis, arthritis, fatigue, diarrhea, joint pain and seizures, and concluded that they do not prevent

him from engaging in light work with the stated restrictions.  (R. 13-21).  This is consistent with the RFCs contained in the record, and the Court finds no error in this analysis.

Plaintiff also disagrees that there are a significant number of jobs available that he is capable of performing.  Plaintiff stresses that he has between two and five bowel movements per day "during which he may need to be in a restroom for 15 minutes at a time."  (Doc. 27, at 11).  The ALJ concluded that normally-scheduled breaks would be sufficient to accommodate such needs, and found Plaintiff capable of working as a housekeeper, retail salesperson or information clerk.  (R. 22, 91-92).  Plaintiff finds this reasoning flawed, noting that he cannot control his bowel movements and "has been virtually tethered to a bathroom." (Doc. 27, at 12).

The problem for Plaintiff is that even assuming that he does need two or three extra breaks during the day in addition to his regular breaks, the VE testified that he would still be able to perform approximately 2,000 housekeeping jobs.  (R. 88-89, 92).  Any error the ALJ made in finding Plaintiff capable of working as a retail salesperson or information clerk is therefore harmless.  *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits.").  Plaintiff posits that a homeowner would not want a "housecleaner who suffered from 2 to 3 daily bouts of diarrhea working in their home and using

their bathroom." (Doc. 37, at 13). Such speculation is not adequate to demonstrate that the ALJ erred in relying on the VE's expert testimony that a person with Plaintiff's stated limitations is capable of working as a housekeeper. *See, e.g., Deitemeyer v. Barnhart*, 61 Fed. Appx. 969, 974 (7th Cir. 2003) ("Because the VE's testimony reflects an understanding of the impairments the ALJ found supported by the evidence . . . the ALJ could reasonably rely on it.").

Plaintiff lastly insists that 2,000 housekeeping jobs is insignificant for purposes of Step Five of the analysis. The Seventh Circuit, however, has stated that "it appears to be well-established that 1,000 jobs is a significant number." *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). Plaintiff cites to no contrary authority, but attempts to distinguish *Liskowitz* by arguing that the claimant in that case lived in Milwaukee, as opposed to "Chicago/Naperville/Joliet," where "[m]illions of people reside." (Doc. 27, at 13). The Seventh Circuit, however, did not base its determination of number significance on the claimant's geographic location. Indeed, the court cited a variety of cases from outside this jurisdiction that found even less than 2,000 jobs to be significant. *Liskowitz*, 559 F.3d at 743 (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs); *Barker v. Secretary of Health & Human Servs.*, 882 F.2d 1474, 1479 (9th Cir. 1989) (1,266 jobs); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (850 - 1,000 jobs)).

In sum, the ALJ's hypothetical questions to the VE properly included all medically supported limitations, and there are a significant number of

housekeeping jobs that Plaintiff can perform.  The ALJ's decision in that regard is supported by substantial evidence and need not be reversed.

### 4.    New Evidence

Plaintiff finally argues that the Court should remand the case so that the ALJ can consider a letter from Dr. Kallwitz dated November 21, 2011.  Sentence six of 42 U.S.C. § 405(g) authorizes courts to remand a case to the Commissioner if "the claimant submits 'new and material evidence' that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision 'contrary to the weight of the evidence' in the record."  *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (quoting 20 C.F.R. § 404.970(b)).  "Medical evidence postdating the ALJ's decision, unless it speaks to the patient's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement."  *Id.* at 484.

Here, Dr. Kallwitz drafted a letter on November 21, 2011 stating that Plaintiff has PSC "which has progressed to cirrhosis," and ulcerative colitis. These conditions have resulted in "multiple complications including hospitalizations for infections" and "multiple joints with arthritis."  (Doc. 27-2).  Dr. Kallwitz noted that Plaintiff's "disease course is expected to be chronic and he will likely require liver transplantation in the future."  He then concluded that "I think that it is unlikely he will be able to maintain employment given these medical conditions."  (*Id.*).  Plaintiff claims that this letter "is material because it

provides additional evidence confirming [his] deteriorating condition." (Doc. 37, at 15). The Court disagrees.

The ALJ considered evidence that Plaintiff suffers from PSC and ulcerative colitis, and Dr. Kallwitz's letter offers no new diagnoses in that regard. *Cf. Farrell v. Astrue*, 692 F.3d 767, 770-71 (7th Cir. 2012) (where the plaintiff's doctor conducted tests newly confirming a diagnosis of fibromyalgia, the materiality of that evidence was "beyond question."). In addition, Dr. Abraham observed in June 2010 that Plaintiff's liver cirrhosis was "well compensated," and Dr. Kallwitz does not contradict this finding anywhere in his letter. Nor does he describe any new test results that bear on Plaintiff's condition at the time of the administrative hearing. His observation that Plaintiff's condition is chronic is not new, as Dr. Slodki reported the same thing in April 2010. (R. 604). Dr. Clark similarly noted the progressive nature of PSC as early as December 2002. (R. 306).

The fact that Plaintiff will "likely require" a liver transplant at some point in the future, or has experienced recent complications, is also not probative of whether he was disabled at the time of the hearings. *McFadden v. Astrue*, 465 Fed. Appx. 557, 560 (7th Cir. 2012) (evidence which shows that an impairment has worsened "is not material because it does not describe [the plaintiff's] condition in the period before the ALJ rendered her decision."). Notably, Dr. Clark commented on this possibility as far back as December 2002, meaning it is not new. (R. 306). If Plaintiff's condition has in fact gotten worse, his recourse is

to file a new application for benefits, not seek to revisit the ALJ's decision regarding his current application. *Getch*, 539 F.3d at 484.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 27) is denied and the Commissioner's Motion for Summary Judgment (Doc. 35) is granted. The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: January 7, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge